0202

Joseph WELCH, Appellant, v. Thomas A. WHITAKER, Respondent.

(317 S. E. (2d) 758)

Court of Appeals

*J. Stanton Cross, Jr.*, of *Cross, Singleton & Burroughs*, Conway, *for appellant.*

*O. Allen Alexander*, for *McCutcheon, McCutcheon & Baxter*, Conway, *for respondent.*

Heard Feb. 28, 1984.

Decided June 22, 1984.

GOOLSBY, Judge:

This is a medical malpractice action. The appellant Joseph Welch appeals the granting of a nonsuit and a directed verdict in favor of the respondent Thomas A. Whitaker, M.D., an ophthalmologist, as to causes of action for breach of an implied contract and for negligence. We affirm.

The issues of appeal are: (1) whether the trial court erred in refusing to allow Welch to place in evidence a letter from another ophthalmologist to Whitaker; (2) whether the trial court erred in limiting the introduction of a letter from Whitaker to Welch's employer solely to the cause of action for negligence; (3) whether the trial court erred in granting a nonsuit in Whitaker's favor as to Welch's cause of action for breach of an implied contract; and (4) whether the trial court erred in directing a verdict in Whitaker's favor as to Welch's cause of action for negligence.

Welch worked as the manager of a machine shop. On October 6, 1978, a foreign metallic object somehow became lodged in his right eye. Welch did not discover it until the following day when his eye began to hurt. He went to the emergency room at the Myrtle Beach Hospital where he saw Whitaker. Whitaker extracted the object and, using a burr, also removed a rust buildup from Welch's eye. Whitaker provided Welch follow-up treatment as well. When Welch, however, was unable to secure an appointment with Whitaker, another ophthalmologist, James M. Marshall, M.D., examined Welch. Marshall also found a rust buildup and removed it. In August, 1979, Welch returned to Marshall's office complaining about the vision in his right eye. Marshall referred him back to Whitaker. The latter examined Welch and concluded that his eye was scarred and that nothing could be done about it. The scarring was caused by the removal of rust from the Bowman's layer of the cornea. This action followed.

**1.**

The first issue for our determination concerns whether the trial court erred in not permitting Welch to introduce an obviously vituperative letter from Marshall to Whitaker ["I dislike writing letters of this type, but ..."]. Although the letter briefly outlined Marshall's treatment of Welch ["Under the slit lamp this rust particle was easily flipped off"], it also reported accusations made by Welch against Whitaker ["(T)hat fellow over at Myrtle Beach damn near killed me" and "I know who is responsible for my blurred vision, it's that ... over at Myrtle Beach"], suggested the approach Marshall thought Whitaker should have taken in explaining Welch's vision problem to Welch ["The manly approach to this could have been 'Mr.Welch, this metallic foreign body was in a rather precarious position on your eye and I removed it with utmost skill ...' "] and criticized Whitaker for the approach he allegedly did take ["You took the easy way out and blamed the other fellow"].

In attempting to introduce the letter, Welch purported that it showed what "Marshall did", that Whitaker blamed Marshall for Welch's vision problem, and that Whitaker attempted to "cover up." The trial court deemed the letter irrelevant. Welch's exception on appeal embraces only the argument that the letter was relevant to the issue of what he refers to as "fraudulent concealment," an allegation included in his cause of action for breach of an implied contract. We hold, however, that the trial judge properly disallowed the letter in evidence.

As this court recently observed, "[t]he admission and rejection of evidence is largely within the sound discretion of the trial judge, and the exercise of his discretion in either admitting or rejecting evidence will not be reviewed by the Court of Appeals absent a clear showing that the trial judge abused his discretion, committed legal error in its exercise, and prejudiced the appellant's rights." *Cudd v. John Hancock Mutual Life Ins. Co.*, 310 S. E. (2d) 830, 833 (S. C. App. 1983); *see also Fetner v. Aetna Life Ins. Co.*, 199 S. C. 79, 18 S. E. (2d) 521 (1942). A manifest abuse of discretion has not been shown in this instance. Indeed, when the letter's overall contents are considered, reversible error would have occurred had the trial judge admitted it over Whitaker's objection. *See*

*Woodward v. S. C. Farm Bureau Ins. Co.*, 277 S. C. 29, 282 S. E. (2d) 599 (1981) (where introduction of letter relating to treatments given by plaintiff physician in libel and slander action to a claimant held to constitute reversible error because letter also contained much language that was self-serving and irrelevant and therefore went "far beyond the stated purpose of demonstrating treatments").

Apart from that, Welch has not demonstrated that his rights were prejudiced by the trial court's refusal to allow the letter in evidence. While the letter does indicate that Marshall believed Whitaker was not truthful with Welch ["I was truly shocked when Mr. Welch came back and told me that you were quite cool to him and inferred that you were not responsible for his blurred vision but it was rather the treatment I had given him"], Welch could have examined Marshall upon the subject when Marshall testified on direct examination.

Moreover, the document involved much inadmissible hearsay and was therefore excludable on that ground alone. *Lee v. Gulf Ins. Co.*, 248 S. C. 296, 149 S. E. (2d) 639 (1966); *Cooper Corp. v. Jeffcoat*, 217 S. C. 489, 61 S. E. (2d) 53 (1950); 31A C. J. S. *Evidence* § 193a at 520 (1964); *Id.* § 194a at 547; *see Culbreath v. Investors Syndicate*, 203 S. C. 213, 26 S. E. (2d) 809, 147 A. L. R. 1144 (1943) (letter held to be inadmissible hearsay). We realize that the trial judge did not exclude the letter from the evidence because it was hearsay; however, we are not precluded from affirming the trial judge on that basis. 5 C. J. S. *Appeal & Error* § 1464(3) at 673 (1958); *see Sheriff v. City of Easley*, 178 S. C. 504, 183 S. E. 311 (1936) (trial judge's ruling refusing nonsuit motion would not be disturbed on appeal where proper conclusion reached on wrong principle).

2.

The next issue for our determination concerns a letter the trial judge permitted Welch to introduce. The trial judge allowed in evidence a letter from Whitaker to Welch's employer, Grove Manufacturing Company, but the trial judge limited the letter to the issue of negligence only. In deciding Whitaker's motion for nonsuit as to Welch's cause of action for a breach of an implied contract, the trial judge gave the document no consideration whatever. Welch maintains that the letter should have been admitted on the issues raised by

his breach of implied contract claim, particularly the issue involving fraudulent concealment. The letter recites that, when Whitaker saw Welch on October 10, 1978, he diagnosed him as having a "corneal rust ring with epithelial defect," that he did not remove the rust ring from Welch's eye because "of its depth and the possibility of resultant corneal scarring," and that a corneal nebulae resulted from the "removal of the rust ring . . . performed elsewhere."

We fail to see how Welch was prejudiced by the trial judge's qualification of the document. Also in evidence was a letter from Whitaker to Marshall in which Whitaker stated that he first saw Welch in October, 1978, when he removed "a metallic foreign body" from Welch's eye, that he observed "a small amount of rust remaining at the time," that he "elected not to remove these rust rings since they appeared rather deep and [he] felt that removing it would result in scarring in his cornea," and that Welch now "has a nebula in the cornea where the initial rust ring was." A clear inference to be drawn from Whitaker's letter to Marshall is that the rust ring was removed by someone other than Whitaker.

Absent a showing by Welch of prejudice, we cannot say that the trial judge's qualification of the letter constituted reversible error.

### 3.

We are also asked to decide whether the trial court erred in granting Whitaker's motion for nonsuit as to the cause of action for breach of an implied contract. Both in his brief and during oral argument before this court, however, Welch conceded that, without the letters previously discussed in evidence on the breach of an implied contract issue, the record would contain no evidence to support the cause of action and a nonsuit of the claim would be appropriate. Since we hold no reversible error occurred when the trial judge refused to allow the first letter in evidence altogether and restricted consideration of the second letter to the issue involving negligence, we need not discuss whether the nonsuit motion was properly granted.

We might add that Welch did not oppose Whitaker's nonsuit motion with any discernible argument at the trial level. He all but acquiesced in the granting of it. *Viz.:*

COURT: Well, what about the second cause of action, breach of contract? . . .

MR. CROSS (Welch's counsel): I hate to say this, but I'll tell you frankly what is in the record now, I would look to get a directed verdict at the end of the trial. . . .

COURT: . . . I just wondered if you viewed the evidence any different than I did on that.

MR. CROSS: No, sir.

*See* 4 Am. Jur. (2d) *Appeal and Error* § 242 at 737 (1962) ("[O]ne who voluntarily acquiesces in . . . a judgment against him cannot appeal from it").

We therefore affirm the granting of the nonsuit.

4.

The last issue we must determine involves Welch's contention that the trial court erred in directing a verdict in Whitaker's favor on the cause of action alleging negligence. He argues that the trial court applied the wrong disclosure standard as to that portion of the negligence claim involving informed consent and that, irrespective of the informed consent issue, there was evidence from which a jury might reasonably conclude Whitaker was negligent in treating Welch's eye and that his negligence was the proximate cause of Welch's impaired vision.

The trial court applied the professional medical standard to that portion of Welch's claim that alleged that Whitaker failed to inform him of the risks inherent in the procedure used by Whitaker to remove foreign matter from an eye. *Woolley v. Henderson*, 418 A. (2d) 1123 (Me. 1980); *Bly v. Rhoads*, 216 Va. 645, 222 S. E. (2d) 783 (1976). It was correct to do so because this court recently adopted the professional standard as the standard by which to measure the duty of a physician to inform a patient of the material risks inherent in a proposed treatment or procedure. *Hook v. Rothstein*, 316 S. E. (2d) 690 (S. C. App. 1984).

In adopting the professional standard, we held that "the scope of a physician's duty to disclose is measured by those communications a reasonable medical practitioner in the same branch of medicine would make under the same or similar circumstances" and that ordinarily the plaintiff must "establish this standard by expert medical evi-

dence." *Id.*, Davis' Advance Sheets at 13. In this instance, there was no expert medical evidence that the recognized standard among ophthalmologists is to inform a patient with a foreign body and rust formations in the cornea of the risks involved in their removal, including the risk of scarring. The trial court properly directed a verdict, therefore, as to the informed consent portion of Welch's cause of action for negligence.

As to whether, informed consent aside, there was suffi-cient evidence in the record of negligence on the part of Whitaker and of proximate cause to warrant the sub-mission of the issue to the jury, we note first of all that a physician is bound to use reasonable care in the performance of professional services. *Bessinger v. DeLoach,* 230 S. C. 1, 94 S. E. (2d) 3 (1956). The failure by a physician to exercise "that degree of care and skill which is ordinarily employed by the profession generally, under similar conditions and in like surrounding circumstances" constitutes medical malpractice. 61 Am. Jur. (2d) *Physicians, Surgeons, and Other Healers* § 205 at 337-38 (1981), *see King v. Williams,* 276 S. C. 478, 279 S. E. (2d) 618 (1981) (degree of care a physician must observe is that of an average competent practitioner acting in the same or similar circumstances). In a medical malpractice case, both the standard of care and the physician's failure to conform to the required standard must be established by expert testimony unless the situation is one in which the common knowledge or experience of laypersons is comprehen-sive enough to permit the recognition or inference of negli-gence from the particular facts. *Kemmerlin v. Wingate,* 274 S. C. 62, 261 S. E. (2d) 50 (1979); *Green v. Lilliewood,* 272 S. C. 186, 249 S. E. (2d) 910 (1978); *Hook v. Rothstein, supra.* A plaintiff in a medical malpractice case must prove proximate cause as well as negligence [*Hanselmann v. McCardle,* 275 S. C. 46, 267 S. E. (2d) 531 (1980)] and proof of proximate cause must be established by expert testimony where "the origin of the injury is obscure and not readily apparent to a layman, or . . . there are several equally probable causes of the condition." *Harris v. Grizzle,* 625 P. (2d) 747, 752 (Wyo. 1981). When expert testimony is not relied upon to establish proximate cause, the plaintiff must offer evidence that "rises above mere speculation or conjecture." *Armstrong v. Weiland,* 267 S. C. 12,

225 S. E. (2d) 851, 853 (1976). And when considering whether to direct a verdict in favor of the defendant in a malpractice case, the trial court must view the evidence and all reasonable inferences arising therefrom in the light most favorable to the plaintiff. *Green v. Lilliewood, supra.*

In asserting that the trial court erred in directing a verdict on the negligence cause of action in Whitaker's favor, Welch points to testimony that the scar in his eye was caused by the removal of rust from the Bowman's layer of his cornea. Welch also cites his own testimony that Whitaker did not anesthetize his eye prior to removing the foreign material from his eye and that he experienced pain during the procedure. He relies too upon the testimony of one of Whitaker's experts that unskillful "grinding" of an eye to remove rust particles could make the damage to a cornea greater than "would ordinarily be expected." We believe this evidence is insufficient to warrant the submission of the case to the jury on the issue of whether Whitaker "exercise[d] the degree of care and skill exercised by others of his profession ... in [removing] the rust from [Welch's] right eye."

With regard to the removal of rust from the Bowman's layer of Welch's cornea, Whitaker testified that, when he attended Welch in the emergency room on October 7, 1978, he did not grind into the Bowman's layer and left intact an underlying rust ring in Welch's eye. The emergency room record reflects simply, "rust ring removed." Marshall, who saw Welch on October 23, 1978, testified that he observed no rust ring *in* Welch's eye at that time but did find *on* his eye a small rust particle that he removed without entering the Bowman's layer.

Assuming Whitaker, and not Marshall, entered the Bowman's layer when removing rust from Welch's cornea, it was not negligent for him to grind into the layer. According to the medical testimony in the case, the cornea is composed of five layers. The epithelium is the outermost layer and the Bowman's membrane is the second layer. When a ferrous metal becomes lodged in the cornea for more than a few hours, rust will form in the cornea around the foreign body. Rust buildup is commonly removed by using an instrument similar to a dental burr, a tool dentists employ in drilling teeth. Grinding with the burr into the Bowman's layer, however, will scar the cornea. Still, the standard ophthalmological

practice is to remove any rust found in the Bowman's layer because the eye is already damaged and leaving rust in the eye will likely cause further damage.

As to the assertion by Welch that Whitaker used no anesthetic to deaden the nerve of Welch's eye before beginning the removal procedure, the evidence is in conflict. Whitaker claimed that he instilled either two or three drops of opthaine, a topical anesthetic, into Welch's right eye and that Welch did not complain of any pain during the procedure. The emergency room record indicates opthaine was used, but it does not say whether it was administered before or after the procedure was done. Welch said the procedure was painful and two of the ophthalmologists who testified stated the presence of pain would indicate that not enough anesthetic was applied. Medical testimony in the case established that a topical anesthetic is usually applied before proceeding with the removal of a foreign body from an eye; however, it is used only for the comfort of the patient and does not affect the results of the case. In any event, negligence cannot be inferred from the bare fact that Welch suffered pain during treatment. *Thomas v. Register*, 110 S. C. 173, 96 S. E. 517 (1918).

Furthermore, no expert testimony established that Whitaker's failure to use either any or enough anesthetic most probably caused or contributed to the cause of the injury sustained by Welch. Without it, the case rested on "mere speculation or conjecture" [*Armstrong v. Weiland,* 225 S. E. (2d) at 853] and was not submissible to the jury on that issue.

Regarding the issue as to the skill employed by Whitaker in grinding Welch's eye, the testimony revealed that unskillful grinding can make the scarring worse; however there was no expert testimony at all that Whitaker's grinding of Welch's eye was not skillful. The mere fact that Welch's eye was scarred does not create a presumption that Whitaker's grinding of his eye was negligently performed. 61 Am. Jur. (2d) *Physicians, Surgeons, and Other Healers* § 332 at 491 (1981). Without expert testimony that Whitaker failed to conform to the applicable standard of care when he ground into Welch's cornea, a directed verdict in Whitaker's favor was entirely proper.

Affirmed.

GARDNER and CURETON, JJ., concur.